﻿Citation Nr: AXXXXXXXX
Decision Date: 12/31/19 Archive Date: 12/31/19

DOCKET NO. 190522-6035
DATE: December 31, 2019

ORDER

An effective date prior to July 27, 2007, for the grant of service connection for posttraumatic stress disorder (PTSD) is denied.

A rating in excess of 30 percent for PTSD for the period between July 27, 2007, and August 29, 2018, is denied.

A rating in excess of 30 percent for a heart disability, to include left ventricular hypertrophy, for the period between July 27, 2007, and August 29, 2018, is denied.

A rating in excess of 20 percent for type II diabetes mellitus (DM) prior to for the period between June 19, 2017, and August 29, 2018, is denied.

A rating in excess of 10 percent for peripheral neuropathy (PN) of the left lower extremity (LLE) for the period between June 19, 2017, and August 29, 2018, is denied.

A rating in excess of 10 percent for PN of the right lower extremity (RLE) for the period between June 19, 2017, and August 29, 2018, is denied.

A rating in excess of 10 percent for PN of the left upper extremity (LUE) for the period between June 19, 2017, and August 29, 2018, is denied.

A rating in excess of 10 percent for PN of the right upper extremity (RUE) for the period between June 19, 2017, and August 29, 2018, is denied.

Entitlement to a total rating based individual unemployability (TDIU) due to service-connected disabilities for the period between June 27, 2007 and August 29, 2018 is denied.

FINDINGS OF FACT

1. The Veteran had active service from April 1968 to November 1978.

2. In an unappealed July 1979 rating decision, the Regional Office (RO) denied service connection for a psychiatric disorder.

3. The initial claim of service connection for PTSD was received by VA on June 27, 2007; there are no documents or communications dated prior to June 27, 2007, that constitute a claim of service connection for PTSD.

4. For the entire period on appeal, PTSD was manifested by subjective complaints of a lack of motivation, decreased interest in hobbies and activities, mistrust of others, a history of interpersonal problems, anxiety, and hypervigilance; objective findings include at worst a constricted affect, intact comprehension, memory, and cognition, judgment within normal limits, an unimpaired, linear, and goal-directed thought process, unremarkable thought content, and clear, logical, and goal-directed speech with normal rate, rhythm, and volume. 

5. For the entire period on appeal, the heart disability was characterized by subjective complaints of sharp chest pains upon over-exertion; objective findings include no congestive heart failure, an ejection fraction of 55 percent at worst, and a MET level, at worst, of 5 without dyspnea, fatigue, angina, dizziness, or syncope. 

6. For the entire period on appeal, DM was manifested by subjective complaints of a need to eat at certain times in order to avoid sickness, weakness, drowsiness or anxiousness; objective findings include treatment with a prescribed oral hypoglycemic agent, no insulin, and no regulation of activities.

7. For the entire period on appeal, PN of the LUE and RUE were characterized by subjective complaints of sharp pain with a burning sensation and associated flare-ups, resulting in difficulty lifting, weakness, and reduced grip strength; objective findings include moderate intermittent pain and no incomplete or complete paralysis, neuritis, or neuralgia.

8. For the entire period on appeal, the Veteran’s PN of the LLE and RLE were characterized by subjective complaints of pain in his bilateral lower extremities with flare-ups and difficulty sleeping, bathing, using tools, and shopping; objective findings include moderate intermittent pain and no moderate incomplete paralysis, neuritis, or neuralgia.

9. For the entire period on appeal, the Veteran was not unemployable solely due to service-connected disabilities.

CONCLUSIONS OF LAW

1. The criteria for an effective date prior to July 27, 2007, for the grant of service connection for PTSD have not been met. 38 U.S.C. § 5110 (2012); 38 C.F.R. §§ 19.2, 3.157, 3.400 (2019). 

2. The criteria for a rating in excess of 30 percent for PTSD for the period between July 27, 2007 and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.130, Diagnostic Code (DC) 9411 (2019).

3. The criteria for a rating in excess of 30 percent for a heart disorder, to include left ventricular hypertrophy, for the period between July 27, 2007, and August 29, 2018 have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.104, DC 7007 (2019). 

4. The criteria for a rating in excess of 20 percent for type II DM for the period between June 19, 2017, and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.120, DC 7913 (2019).

5. The criteria for a rating in excess of 10 percent for PN of the LLE for the period between June 19, 2017, and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.124a, DCs 8520 – 8526, 8620 – 8626, 8720 - 8726 (2019).

6. The criteria for a rating in excess of 10 percent for PN of the RLE for the period between June 19, 2017, and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.124a, DCs 8520 – 8526, 8620 – 8626, 8720 - 8726 (2019).

7. The criteria for a rating in excess of 10 percent for PN of the LUE for the period between June 19, 2017, and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.124a, DCs 8510 – 8519, 8610 – 8619, 8710 - 8719 (2019).

8. The criteria for a rating in excess of 10 percent for PN of the RUE for the period between June 19, 2017, and August 29, 2018, have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A (2012); 38 C.F.R. §§ 19.2, 4.1, 4.2, 4.7, 4.124a, DCs 8510 – 8519, 8610 – 8619, 8710 - 8719 (2019).

9. The criteria for the grant of a TDIU for the period between June 27, 2007 and August 29, 2018, have not been met. 38 U.S.C. § 1155 (2012); 38 C.F.R. §§ 19.2, 3.340, 3.341, 3.400, 4.16 (2019)

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law, which went into effect in February 2019, has created a new framework for veterans dissatisfied with a VA decision on their claim to seek review.

As a procedural matter, on August 29, 2018, VA received notice that the Veteran chose to participate in VA’s test program, the Rapid Appeals Modernization Project (RAMP). He selected the Higher Level Review (HLR) lane when he submitted the RAMP election form. Accordingly, the January 2019 HLR rating decision considered the evidence as of the date VA received the RAMP election form. 

Subsequently in May 2019, the Veteran timely submitted a Form 10182, appealing the HLR rating decision, opting into the AMA system, and selecting the direct review lane under which the Board would decide his appeal based on the evidence of record at the time of the prior HLR rating decision. 38 C.F.R. § 19.2(d). Accordingly, the Board will apply the AMA in adjudicating this case. However, as he initially selected the HLR lane under RAMP, the Board will consider the evidence as of the date VA was notified of his participation in the RAMP process.

Earlier Effective Date for the Grant of Service Connection for PTSD

The effective date of an award based on a claim for increase of compensation “shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application.” 38 U.S.C. § 5110(a). The effective date for increased rating shall be the earliest date of which it is factually ascertainable that an increase in disability had occurred, if the claim is received within one year from such date; otherwise, the effective date for increased ratings shall be the date of receipt of claim or date entitlement arose, whichever is later. 38 C.F.R. § 3.400(o)(1). 

An effective date for an increased rating may be assigned later than the date of receipt of the claim, if the evidence shows that the increase in disability actually occurred after the claim was filed, but never earlier than the date of receipt of the claim for increase. In general, “date of receipt” means the date on which a claim, information or evidence was received in VA. 38 C.F.R. § 3.1(r). A claim is a “formal or informal communication in writing requesting a determination of entitlement or evidencing a belief in entitlement to a benefit.” 38 C.F.R. § 3.1(p).

The Veteran contends that PTSD warranted an effective date earlier than July 27, 2007. In its January 2019 HLR Rating Decision, the AOJ identified no favorable findings, but affirmed the assignment of an effective date of the date on which it first received the claim – July 27, 2007 – for PTSD.

The record shows that the Veteran filed an original claim of service connection for a psychiatric disorder in January 1979. The RO denied service connection in July 1979; however, he did not appeal the July 1979 rating decision. The next document of record after the July 1979 decision was a July 2007 formal claim for service connection for multiple disorders, including PTSD, that was received by VA on July 27, 2007. 

The RO granted a 30 percent rating for PTSD, effective on July 27, 2007, the date of the formal claim. There were no earlier claims received subsequent to the unappealed July 1979 rating decision which denied service connection for a psychiatric disorder. Moreover, as he separated from service in November 1978 and submitted the current claim over a year later, he is not entitled to an effective date within one year of discharge from service.

A review of the record shows that the Veteran had a positive screen for PTSD on August 21, 2007, and was diagnosed with PTSD on February 4, 2008. The record is otherwise silent for complaints of or treatment for PTSD. 

As noted above, review of the record reveals no other communication subsequent to the July 1979 rating decision that may reasonably be construed as a formal or informal claim for service connection for PTSD until the July 27, 2007, claim. Finally, the medical evidence does not establish a positive screen for PTSD until August 21, 2007, and a post-service diagnosis of PTSD until February 4, 2008.

For these reasons, the medical evidence does not support an effective date prior to July 27, 2007. 

Increased Rating Claims

Disability evaluations are determined by the application of a schedule of ratings which is based on average impairment of earning capacity. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. 

Where there is a question as to which of two separate evaluations shall be applied, the higher evaluation will be assigned if the disability more closely approximates the criteria required for that particular rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the veteran. 38 C.F.R. § 4.3. 

PTSD

In addition to the above, acquired psychiatric disorders, including PTSD, are evaluated under a General Rating Formula for Mental Disorders (“General Rating Formula”). Under the General Rating Formula, a 30 percent rating is warranted for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, or recent events).

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect, circumstantial, circumlocutory, or stereotyped speech, panic attacks occurring more than once a week, difficulty in understanding complex commands, impairment of short-term memory (i.e. retention of only highly learned material or forgetting to complete tasks), impaired judgment, impaired abstract thinking, disturbances of motivation and mood, and difficulty in establishing effective work and social relationships. 

The symptoms listed under the rating criteria are meant to be examples of symptoms that would warrant the rating, but they are not meant to be exhaustive, and the Board need not find all or even some of the symptoms to award a specific rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

The Veteran contends that PTSD warranted a rating in excess of 30 percent because he had significant difficulties getting along with others, felt hopeless and suicidal, and had a Global Assessment Functioning (GAF) score between 43 and 45. In the January 2019 HLR Decision, the AOJ made no favorable findings and assigned a 30 percent rating based on an occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only periods of significant stress, and PTSD symptoms including: suspiciousness, depressed mood, anxiety, and a chronic sleep impairment. 

Turning to the evidence, disturbances of motivation and mood have been shown. In this regard, an August 2010 medical treatment note found that the Veteran’s mood was characterized by states of sadness, depression, anxiety, boredom, guilt, shame, anger, alienation, emptiness, impending doom, and feeling overwhelmed. Furthermore, in a June 2017 affidavit, he reported that he was not motivated to do anything and lost interest in hobbies and activities he previously enjoyed, such as volunteering with his church. Therefore, the medical evidence establishes disturbances of motivation and mood.

The evidence further establishes difficulty establishing effective work and social relationships. In this regard, the Veteran reported in a June 2017 affidavit that he was mistrustful of others, had a history of severe interpersonal problems, and kept to himself. He asserted that he struggled to obtain or maintain effective friendships and relationships. 

Additionally, a private clinician noted in an August 2017 vocational assessment that he had problems with supervisors and coworkers and became irritated talking to others, arguing with them without acknowledging a reason. Therefore, the medical evidence establishes difficulty establishing effective work and social relationships.

However, a flattened affect, difficulty understanding complex commands, and impaired judgment and short-term memory have not been shown. In this regard, the medical treatment notes and VA examinations revealed, at worst, a constricted affect. Similarly, September 2009 and September 2017 VA examinations found the Veteran’s comprehension, memory, and cognition to be intact. The examinations further found his judgment to be within normal limits. As such, the medical evidence does not support a flattened affect, difficulty understanding complex commands, impaired judgment, and impaired short-term memory, or any symptoms like or similar to those.

As to impaired abstract thinking, medical treatment notes and the Veteran’s September 2009 and 2017 VA examinations found his thinking to be abstract with an unimpaired, linear, and goal-directed thought process, and unremarkable thought content. 

As to panic attacks and impaired speech, the medical treatment notes and VA examinations consistently found the Veteran’s speech to be clear, logical, and goal-directed, with normal rate, rhythm, volume, and content. Similarly, while he was consistently noted to be anxious, uncomfortable in crowds, and hypervigilant, the medical evidence did not find that he experienced panic attacks more than once a week. Accordingly, impaired abstract thinking, panic attacks more than once a week, and circumstantial, circumlocutory, or stereotyped speech, or any symptoms like or similar to those, are not shown.

Based on the above, a rating in excess of 30 percent is not warranted for the entire period on appeal. In this regard, the evidence demonstrated that the Veteran had disturbances of motivation and mood, difficulty establishing effective work and social relationships, anxiety, discomfort in crowds, and hypervigilance. However, the evidence failed to establish that he had a flattened affect, difficulty understanding complex commands, impaired judgment, impaired short-term memory, impaired abstract thinking, panic attacks more than once a week, circumstantial, circumlocutory, or stereotyped speech, or any symptoms like or similar to those supporting a higher rating. Accordingly, the medical evidence does not support a rating in excess of 30 percent. 

As noted above, the Veteran argued that he was assigned a GAF score between 43 and 45 and as a result was entitled to a higher rating for his PTSD. Under the previous DSM-IV, GAF scores reflect the “psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.” Carpenter v. Brown, 8 Vet. App. 240 (1995); see also Richard v. Brown, 9 Vet. App. 266 (1996).

The current DSM-5 has eliminated the use of GAF scores, since they have been shown to have a lack of reliability and poor clinical utility; however, to the extent that the GAF scores are relevant to the appeal, GAF scores are just one part of the medical evidence to be considered and are not automatically dispositive of the assignment of a particular rating. As such, the raw number provided in the GAF score is outweighed by the medical evidence and does not on its own warrant a rating in excess of 30 percent for PTSD. 

Heart Disorder, to Include Left Ventricular Hypertrophy

The Veteran contends that he should be granted a rating in excess of 30 percent for a heart disability because of worsening chest pain. In the January 2019 HLR Rating Decision, the AOJ made no favorable findings for an increased rating and assigned a rating of 30 percent under DC 7007 based on evidence of cardiac hypertrophy on an echocardiogram.

As noted above, the Veteran’s heart disorder is rated under DC 7007. The Board will consider all relevant diagnostic codes. Under the relevant regulations, a rating in excess of 30 percent will be warranted when the objective medical evidence shows the following:

• More than one episode of acute congestive heart failure in the past year (60 percent under DC 7007);

• A workload of greater than 3 METs, but not greater than 5 METs resulting in dyspnea, fatigue, angina, dizziness, or syncope (60 percent under DC 7007); or

• Left ventricular dysfunction with an ejection fraction (EF) of 30 to 50 percent (60 percent under DC 7007). 

In a February 2008 VA examination, the Veteran reported experiencing chest pain, especially with exertion, with associated nausea and diaphoresis. The examiner found that his estimated METs were difficult to assess, but noted that the Veteran felt he could most likely achieve 3 METs. An echocardiogram revealed severe concentric left ventricular hypertrophy with normal systolic function. The echocardiogram additionally identified a mitral inflow pattern suggestive of diastolic dysfunction secondary to left ventricular hypertrophy. The examiner ultimately diagnosed coronary artery disease (CAD).

In June 2008 and February 2010 medical treatment notes, clinicians found that the Veteran had a MET level of 7 and an EF of 55 percent. In a subsequent February 2010 VA examination, the examiner found no congestive heart failure, rheumatic heart disease, or history of myocardial infarction or COPD. The examiner noted a MET level of 5, but did not observe that the MET level resulted in dyspnea, fatigue, angina, dizziness, or syncope. The examiner ultimately diagnosed recurrent chest pain without evidence of an ischemic heart disease (IHD). 

In a July 2011 VA examination, the examiner found that the Veteran had no history of CAD, or IHD and that he did not have congestive heart failure. The examiner reported that the Veteran had a MET level of greater than 5 to 7 METs, which resulted in dyspnea and fatigue, and evidence of dilation that as likely as not constituted ischemic cardiomyopathy. Upon examination, the Veteran was found to have an EF of 70 percent. The examiner remarked that his EKG revealed a normal sinus rhythm with no evidence of infarction.

In a May 2014 VA examination, the Veteran reported that he had sharp pain if he over-exerted himself. The examiner found that the heart conditions did not qualify as an IHD, and that he had no myocardial infarction, congestive heart failure, cardiac arrhythmia, heart valve condition, infectious heart condition, or pericardial adhesions. Upon examination, the Veteran was found to have an EF of 70 percent and a MET level of greater than 5 to 7 METs that resulted in dyspnea and fatigue. The examiner ultimately diagnosed concentric left ventricular hypertrophy without functional impairment and opined that there was insufficient evidence to warrant or confirm a diagnosis of acute or chronic IHD or CAD. 

Based on the above, the medical evidence does not support a rating in excess of 30 percent. In this regard, the examinations did not identify any episodes of congestive heart failure and found an EF of, at worst, 55 percent. Furthermore, while the February 2010 VA examination revealed that the Veteran had a MET level of 5, the examiner did not find that the February 2010 MET level resulted in dyspnea, fatigue, angina, dizziness, or syncope. The examinations otherwise found MET levels that were greater than 5. As such, the medical evidence does not support a rating in excess of 30 percent for a heart disability. 

Peripheral Neuropathy of the Bilateral Lower Extremities

The Veteran contended that he should be granted ratings in excess of 10 percent for PN of the LLE and RLE, respectively, because the disabilities worsened and caused “significant problems.” In the January 2019 HLR Rating Decision, the AOJ made no favorable findings and assigned 10 percent ratings under DC 8521 based on evidence that the two disabilities were characterized by moderate intermittent pain.

As noted above, PN of the LLE and RLE are each rated under DC 8521. The Board will consider all relevant diagnostic codes. Under the relevant regulations, ratings in excess of 10 percent will be warranted when the objective medical evidence shows either:

• moderate incomplete paralysis, neuritis, or neuralgia of the sciatic, external popliteal, internal popliteal, or anterior crural nerves (20 percent under DCs 8520 – 8526, 8620 – 8626, and 8720 – 8726); or

• severe incomplete paralysis, neuritis, or neuralgia of the musculocutaneous, anterior tibial, or posterior tibial nerves (20 percent under DCs 8520 – 8526, 8620 – 8626, and 8720 – 8726). 

In a June 2017 statement, the Veteran asserted that neuropathy of the bilateral lower extremities had become more painful and was causing significant problems, to include pain in his legs, and flare-ups. He subsequently reported to an August 2017 private clinician that he had increased difficulty getting into his bathtub at home, shopping, or safely using tools or lawnmower equipment due to the increased pain. 

In a September 2017 VA examination, the Veteran described neuropathic pain in the LLE and RLE that was generally apparent at nights and after prolonged standing or walking and resulted in sleep disturbances. The examiner diagnosed PN of the bilateral lower extremities and identified symptoms including moderate intermittent pain; however, the examiner found that PN resulted in no constant pain, no paresthesias or dysesthesias, and no numbness in the bilateral lower extremities. The examiner noted that his sciatic, external popliteal, musculocutaneous, anterior tibial, internal popliteal, posterior tibial, or anterior crural nerves were normal bilaterally and ultimately remarked that the neurological examination of the Veteran’s neuropathy was unremarkable.

Based on the above, ratings in excess of 10 percent are not warranted for PN of the LLE and RLE. In this regard, the Veteran reported worsening pain that resulted in sleep difficulties, difficulty getting into his bathtub, difficulty shopping, and an inability to safely use tools or lawnmower equipment. Furthermore, the September 2017 VA examination identified bilateral moderate intermittent pain in his lower extremities as a result of his peripheral neuropathies; however, the examination found the nerves in his lower extremities to be normal bilaterally, identifying no moderate incomplete paralysis, neuritis, or neuralgia in his bilateral lower extremities. Accordingly, the medical evidence does not support ratings in excess of 10 percent for PN of the LLE and RLE.

Peripheral Neuropathy of the Bilateral Upper Extremities

The Veteran contends that he should be granted ratings in excess of 10 percent for PN of the LUE and RUE, respectively, because the disabilities worsened and caused significant problems. In the January 2019 HLR Rating Decision, the AOJ made no favorable findings and assigned ratings of 10 percent under DC 8515, finding that the two disabilities were characterized by mild intermittent pain. 

As noted above, the Veteran’s PN of the LUE and RUE are rated under DC 8515. The Board will consider all relevant diagnostic codes. Under the relevant regulations, a rating in excess of 10 percent will be warranted when the objective medical evidence shows the following: 

• Mild incomplete paralysis, neuritis, or neuralgia of the upper radicular group, middle radicular group, lower radicular group, or all radicular groups (20 percent under DCs 8510-8513, 8610-8613, 8710-8713);

• mild incomplete paralysis, neuritis, or neuralgia of the radial nerve (20 percent under DCs 8514, 8614, 8714); 

• moderate incomplete paralysis, neuritis, or neuralgia of the radial, median, or ulnar nerves (20 percent under DCs 8514-8516, 8614-8616, 8714-8716); 

• severe incomplete paralysis, neuritis, or neuralgia of the musculocutaneous, circumflex, or long thoracic nerves (20 percent under DCs 8517-8519, 8617-8619, 8717-8719); or

• complete paralysis, neuritis, or neuralgia of the minor musculocutaneous or long thoracic nerves (20 percent under DCs 8517-8519, 8617-8619, 8717-8719). 

In a June 2017 statement, the Veteran reported that PN of the LUE and RUE had become more painful. He related that his pain was sharp with a burning sensation and occasional flare-ups. He said that his pain caused significant problems, to include difficulty with overhead lifting, weakness in his arms, difficulty performing tasks independently, a loss of grip strength, a history of dropping items, and difficulty shaving. In an August 2017 private vocational evaluation, he told a clinician that his neuropathies further made it difficult for him to get into the bathtub at home, shop, or safely use tools or lawn mower equipment. 

In a subsequent September 2017 VA examination, the Veteran reported experiencing pain that was present at nights and resulted in sleep disturbances. The examiner diagnosed PN of the LUE and RUE characterized by moderate intermittent pain; however, the examiner did not find that the disabilities resulted in constant pain, paresthesias, dysesthesias, or numbness. 

The examiner further did not identify any incomplete or complete paralysis, neuritis, or neuralgia bilaterally of either the Veteran’s upper radicular group, middle radicular group, lower radicular groups or his radial, median, ulnar, musculocutaneous, circumflex, or long thoracic nerves. Rather, the examiner found the Veteran’s radicular and upper extremity nerve groups to be normal bilaterally.

Based on the above, the medical evidence does not support ratings in excess of 10 percent. In this regard, the Veteran reported worsening neuropathic pain in his upper extremities that impacted his ability to lift overhead and perform tasks such as shaving and bathing independently. He explained that as a result of the pain, he developed weakness in his bilateral arms and decreased grip strength. Furthermore, the September 2017 VA examination found that the two disabilities were characterized by moderate intermittent pain. As such, the medical evidence does not support ratings in excess of 10 percent for PN of the bilateral upper extremities. 

The Board has considered statements made by the Veteran indicating the current severity of the disabilities discussed above. He is competent to report symptoms because this requires only personal knowledge as it comes to him through his senses. However, he is not competent to identify specific levels of disability of these disorders according to the appropriate diagnostic codes. 

Such competent evidence concerning the nature and extent of the disabilities discussed above have been provided by the medical personnel who have examined him during the current appeal and who have rendered pertinent opinions in conjunction with the evaluations. The medical findings (as provided in the VA examinations and medical treatment records) directly address the criteria under which his disabilities are evaluated.

Moreover, as the clinicians have the requisite medical expertise to render medical opinions regarding the degrees of impairment caused by the disabilities and had sufficient facts and data on which to base the conclusions, the Board affords the medical opinions great probative value. As such, these records are more probative than the subjective evidence of complaints of increased symptomatology provided by the Veteran, and the appeals are denied.

Consideration has been given to assigning staged ratings. However, at no time during the periods in question have the disabilities warranted higher schedular ratings than those assigned. Hart v. Mansfeld, 21 Vet. App. 505 (2007). 

TDIU

TDIU ratings may be assigned where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more and there are sufficient additional service-connected disability ratings to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a). 

For the entire period on appeal, the Veteran has been service-connected for a heart disorder at 30 percent, PTSD at 30 percent, DM at 20 percent, and PN of the bilateral upper and lower extremities at 10 percent each. The combined rating is at 80 percent; however, the Veteran does not have a disability currently ratable at 40 percent or more. Therefore, the schedular criteria for a TDIU are not met. 

Generally pursuant to 38 C.F.R. § 4.16(b), when a claimant is unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities but fails to meet the percentage requirements for eligibility for a total rating set forth in 38 C.F.R. § 4.16(a), such case shall be submitted for extraschedular consideration in accordance with 38 C.F.R. § 3.321. 

However, under the AMA the Board may remand only for correction of duty to assist errors under 38 U.S.C. § 5103A that occurred prior to the date of the AOJ decision or for correction of any other error made by the AOJ in satisfying a regulatory or statutory duty if correction of the error would have a reasonable possibility of aiding in substantiating the claim. 

Accordingly, in the absence of a duty to assist error or an AOJ error whose correction would have a reasonable possibility of aiding in substantiating the claim, a claim of TDIU under 38 C.F.R. § 4.16(b) may be decided by the Board in the first instance. Here, therefore, the Board will consider whether the Veteran is entitled to a TDIU on an extraschedular basis. 

As noted above, TDIU on an extraschedular basis is warranted under 38 C.F.R. § 4.16(b) for veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities but do not meet the schedular criteria set forth in 38 C.F.R. § 4.16(a). 

In assessing whether an extraschedular TDIU is warranted, the determination must be supported by “a full statement as to the veteran’s service-connected disabilities, employment history, educational and vocational attainment, and all other factors having a bearing on the issue.” 38 C.F.R. § 4.16(b). Ultimately, the Board must determine whether a veteran’s combined service-connected disabilities, despite failing to meet the schedular criteria, inhibited his or her capacity to perform the physical and mental acts required for employment. 

The Veteran has reported that he was last able to work full-time in July 2006, at which time he became too disabled to maintain a substantially gainful occupation at a level consistent with his prior experience. A review of the record reveals that he had experience working in the custodial and housekeeping departments for hospitals, graduated high school, and earned an Associate’s degree in hospitality management, as well as certificates in upholstery and cooking and baking. 

In a November 2006 Disability Determination, the Social Security Administration (SSA) found the Veteran to be disabled for purposes of eligibility for social security benefits. The SSA noted that he was primarily diagnosed with a total knee replacement and had no secondary diagnoses. In a related September 2006 disability report, he indicated that he stopped working in July 2006 due surgery on the right knee. At the time, neither he nor the SSA identified any other disability, to include his now-service-connected disabilities, that either prevented him from working or served as a basis for his eligibility for social security benefits. 

In a series of VA examinations between February 2008 and May 2014, examiners diagnosed a heart disorder, to include CAD and recurrent chest pain. The examiners found that the MET level was 5 at worst and observed that the Veteran was able to perform light gardening, lawn moving, and independent driving. The examiners opined that any MET level limitation was not due solely to a heart disorder, but rather due to multiple factors, to include obesity and arthritis. While the examiners noted limitations related to arthritic joints, they ultimately opined that the heart disability did not impact his ability to work or perform activities of daily living. 

Similarly, in February 2009 and June 2014 VA examinations, examiners did not diagnose a psychiatric disorder and ruled out an adjustment disorder with mixed anxiety and depressed mood. The examiners related that the Veteran described multiple psychiatric symptoms and that he worked in environmental services until 2006 and as a doorman until January 2014. The examiners further observed that he had to leave his jobs due to knee replacement surgery and health issues, respectively; however, they did not indicate that his health issues were related to his psychiatric symptoms and opined that the relationship between his mental health and occupational and social functioning was unclear.

In a June 2017 lay statement, the Veteran reported that he retired from full-time work in 2006 and from work in any capacity in 2015. He explained that prior to 2006, he worked within custodial services for hospitals, was on his feet for the entirety of the workday, and had multiple physical duties, including a lot of lifting. He asserted that he regularly experienced pain in his bilateral arms and legs due to service-connected neuropathy of his bilateral upper and lower extremities. 

He said that he subsequently attempted to work as a doorman after 2006, but that PN affected his legs and arms, complicated his ability to perform physical tasks, and prevented him from comfortably working. He opined that the service-connected neuropathic disabilities prompted him to leave his job in 2015 and prevented him from working in any capacity since that time.

In a subsequent August 2017 private vocational assessment, the clinician opined that the Veteran was unemployable, was unable to work at a substantial gainful activity level since 2006, and would be unable to do so in the future. The clinician further asserted that it was at least as likely as not that the Veteran was unable to secure and follow substantially gainful employment, even at a sedentary level, since 2006, explaining that he was unable to sit for a period of more than 10 to 15 minutes without having to move around, and was thus unable to meet the physical requirements for sedentary employment.

The clinician observed that the Veteran required frequent unscheduled breaks to relieve his physical and mental difficulties as a result of his service-connected disabilities. The clinician explained that employers would not tolerate the frequency and duration of breaks that the Veteran required, as his breaks would leave him more off-task than was acceptable. The clinician offered that his PTSD would further impair his ability to complete tasks in a timely and acceptable manner or work alongside others without conflict. Ultimately, the clinician opined that he would be unable to maintain substantially gainful levels of activity.

The clinician acknowledged the Veteran’s post-2006 work as a doorman, but opined that the work was not substantially gainful, noting that the Veteran had only marginal earnings during his time working in the position and that he struggled to meet the requirements of the job.

Most recently, in a series of September 2017 VA examinations, the examiners found that the Veteran’s DM and neuropathies of his bilateral upper and lower extremities did not impact his ability to work, noting that DM was under control and that there was no diagnosed neuropathic condition then-currently apparent. Examiners further found that the PTSD symptoms neither impacted his ability to engage in physical or sedentary work nor precluded him from securing and maintaining substantially gainful employment. The examiners opined that based on the then-current level of functioning, the Veteran was capable of sedentary, flexibly-scheduled employment with limited stress and responsibility, and limited or minimal interaction with staff and customers. 

Based on the above, entitlement to a TDIU for the period on appeal is not warranted. In this regard, the Veteran’s August 2017 private vocational assessment reflected that he was unemployable and unable to secure or follow a substantially gainful occupation in 2006. 

To that end, the clinician found that his service-connected disabilities, to include PN of the bilateral upper and lower extremities and PTSD, impacted his ability to work, noting that they resulted in severe pain in all extremities, poor manual and finger dexterity, a markedly limited ability to stand or walk, an inability to maintain concentration, a need for frequent breaks due to pain, intrusive memories, isolative behavior, and irritability and angry outbursts when interacting with coworkers and supervisors. However, assignment of a TDIU requires that a veteran’s inability to maintain employment be due solely to service-connected disabilities.

In his September 2006 disability report, the Veteran informed the SSA that he stopped working in 2006 as a result of a knee disorder; he was ultimately found eligible in November 2006 for social security benefits on the basis of a total knee replacement. The August 2017 clinician found that the Veteran would be unable to maintain substantially gainful levels of activity as a result of his service-connected disorders, but failed to consider the September 2006 SSA Disability Report, the November 2006 SSA Disability Determination, or the impact of the Veteran’s total knee replacement on his ability to work. As such, the August 2017 private vocational assessment is assigned lesser probative value.

As noted above, the determinative issue when evaluating eligibility for a TDIU is whether a veteran is rendered unable to secure or follow a substantially gainful occupation solely as a result of his service-connected disabilities. The Veteran is not presently, and has not been service-connected for a knee disorder, to include one stemming from a total knee replacement. Therefore, the evidence shows that for the entire period on appeal, his unemployability was not due solely to service-connected disabilities; as such, the material evidence does not support entitlement to a TDIU for the period on appeal. 

The Board has considered the lay statements submitted by the Veteran regarding his capacity to work throughout the entire period on appeal. While he is competent to report symptoms because this requires only personal knowledge as it comes to him through his senses, he is not competent to identify a specific level of symptomatology sufficient to satisfy the requirements of 38 C.F.R. § 4.16.

Such competent evidence concerning the nature and extent of the Veteran’s unemployability has been provided by the medical personnel who have examined him and provided pertinent opinions in conjunction with the evaluations. The medical findings (as provided in the examination reports) directly address the criteria under which his employability is evaluated.

Moreover, as the examiners have the requisite medical expertise to render medical opinions regarding the impact of the Veteran’s service-connected disabilities on his capacity to work and had sufficient facts and data on which to base the conclusions, the Board affords the medical opinions great probative value. As such, these records are more probative than the Veteran’s subjective evidence of unemployability, and the appeal is denied. 

Finally, the Veteran has not raised any other issues, nor have any other issues been reasonably raised by the record for the Board’s consideration. See Doucette v. Shulkin, 28 Vet. App. 366 (2017) (confirming that the Board is not required to 

 

address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 

 

 

L. HOWELL

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board A. Spigelman, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.